UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

―――

AARON ALEXANDER WHITMAN,

                Petitioner,                Case No. 1:09-cv-83

v.                                      Honorable Robert J. Jonker

NICK LUDWICK,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Cass County Circuit Court of one count of conspiracy to commit assault with intent to murder, MICH. COMP. LAWS §§ 750.157a, 750.83; one count of carrying a firearm with unlawful intent, MICH. COMP. LAWS § 750.226; four counts of felonious assault, MICH. COMP. LAWS § 750.82; one count of intentionally discharging a firearm from a motor vehicle, MICH. COMP. LAWS § 750.234a; and eight counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227(b). The trial court sentenced Petitioner on July 14, 2006, to 6 to 10 years' imprisonment for the conspiracy to commit assault with intent to murder conviction; 2 to 5 years' imprisonment for the carrying a firearm with unlawful intent conviction; 2 to 4 years' imprisonment for each of the four felonious assault convictions and his conviction for intentionally discharging a firearm from a motor vehicle; and two years' imprisonment for each of the eight felony-firearm convictions.

In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.      The prosecutor presented insufficient evidence that Petitioner was present or that he aided and abetted the offenses.

II.     The prosecutor presented insufficient evidence to support the conviction for conspiracy to commit assault with intent to murder.

III.    The trial court erred by permitting co-defendant Allen Hatton to testify before the jury without determining whether Hatton was going to assert his Fifth Amendment right not to testify and trial counsel was ineffective for failing to object to Hatton being called as a witness before the jury and insisting that the privilege be exercised outside the presence of the jury.

Respondent has filed an answer to the petition (docket #6) stating that the grounds should be denied because they are procedurally defaulted or have no merit. Petitioner filed a reply (docket#9). Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.      Trial Court Proceedings

The state prosecution arose from a confrontation between a group of three teenagers and a group of five other men at Lawless Park in Cass County on December 12, 2005. The prosecution alleged that Petitioner Aaron Whitman (age 17), co-defendant Jeremy Joseph (age 18) and co-defendant Allen Hatton (age 18) assaulted Derek Fetters (age 18), Michael Whitacre (age 26), Ricky Armstrong (age 40), Johnny Slone (age 40) and Andrew Skibowski (age 25) with baseball bats, and that the fight escalated to shots being fired. Petitioner was tried before a jury on June 13 through 15, 2006.[1]

---

[1]The trial transcripts will be referred to as follows:
Tr. I    Jury Trial Volume I, June 15, 2006 (docket #23)
Tr. II   Jury Trial Volume II, June 16, 2006 (docket #24)
Tr. III  July Trial Volume III, June 15, 2006 (docket #25)

Lindsey Dressler testified that she dated Allen Hatton for about a month in 2005. (Tr. I, 151-52.)  At the time, Dressler was fourteen and Hatton was eighteen. (Tr. I, 151, 155.)  In early December 2005, Dressler was talking on the phone with Hatton.  The conversation made Dressler upset, so she handed the phone to her friend, Sara Taravet. (Tr. I, 152.)  Taravet got angry while she was talking to Hatton. (Tr. I, 153.)  Dressler testified that Petitioner was Hatton's friend and that Hatton lived at Petitioner's house. (Tr. I, 153-54.)

Sara Taravet, who was fourteen years old at the time of trial, testified that Dressler handed her the phone after Hatton said some disrespectful things to Dressler and called her a bad name. (Tr. I, 145.)  When Taravet defended Dressler, Hatton starting calling Taravet bad names. (Tr. I, 145.)  Taravet told Hatton that she was going to call Derek Fetters because he was like her brother. (Tr. I, 145-46.)  Hatton said things during the conversation that made Taravet afraid for her safety, so she hung up the phone, called Fetters and told him about her conversation with Hatton. (Tr I., 146-47.)  Taravet did not ask Fetters to go after Hatton. (Tr. I, 149.)  Hatton tried to call Taravet again, but she did not answer his calls. (Tr. I, 147.)  Taravet testified that Petitioner was a friend of Hatton's, but she did not know Petitioner personally. (Tr. I, 148.)

Michael Whitacre, Andrew Skibowski, Ricky Armstrong and Johnny Slone testified that they went to the Legends Bar in Edwardsburg on the evening of December 12, 2005. (Tr. I, 171; Tr. II, 32, 77-78.)  The men knew each other from working construction jobs together. (Tr. II, 32, 77, 172.)  All four men were drinking at the bar. (Tr. I, 170-73.)  Whitacre had three to five beers at the bar and considered himself "buzzed," but not "wasted." (Tr. I, 172.)  Skibowski testified that he was drinking, but not drunk. (Tr. II, 78-79.)  Slone testified that he had about six beers and five shots. (Tr. II, 173.)  Armstrong testified that he was drunk by the time Fetters arrived at the bar. (Tr. II, 33-34.)  They also knew Fetters from work. (Tr. I, 173; Tr. II, 174.)  When Fetters arrived,

- 3 -

he was agitated about something.  (Tr. I, 174; Tr. II, 34, 80, 174.)  While Fetters was in the bar, he was making calls on his cell phone to a girl and then to some guys.  (Tr. II, 82, 174.)  After Fetters explained why he was agitated, Whitacre, Skibowski, Armstrong and Slone agreed to go with Fetters to Lawless Park.  (Tr. I, 174; Tr. II, 34, 80, 174.)  The men thought that Fetters was going to fight someone over a girl, but were not planning to get involved.  (Tr. I, 177, 192; Tr. II, 35, 175.)  Armstrong testified that he was just going to be Fetters' "back up," and Skibowski testified that he wanted to make sure that it was fair fight between Fetters and one other person.  (Tr. II, 35, 80-81.)

Whitacre, Skibowski, Armstrong and Slone testified that they drove to the park in Whitacre's Bronco.  (Tr. I, 195; Tr. II, 82.)  The men gave somewhat inconsistent testimony about where they were seated in the Bronco.  Whitacre testified that he was seated in the middle of the back seat flanked by Slone and Fetters, and Skibowski and Armstrong were up front.  (Tr. I, 195-96; Tr. II, 36, 175.)  Skibowski testified that he, Whitacre and Armstrong were in the front seat.  (Tr. II, 82-83.)  Skibowski and Slone testified that Whitacre started out as the driver, but Skibowski took over while they were en route.  (Tr. II, 83, 175.)  The men drove about forty-five minutes to Lawless Park.  (Tr. I, 176.)  They did not have any guns or weapons in the truck.  (Tr. I, 178; Tr. II, 177.)  Whitacre testified that he had a two-ton car jack with handles hidden behind the back seat, but he did not discuss the jack with anyone or suggest that it be used as a weapon.  (Tr. I, 179, 202.)  Armstrong was aware of the tools in the back of the truck, but denied handing Fetters a jack handle as they drove to the park.  (Tr. II, 36, 52.)

Whitacre testified that no one was at the park when they arrived, but as they were leaving, a car pulled into the parking lot.  (Tr. I, 199.)  Whitacre got out of the passenger side of the Bronco and he or Fetters was the last person out of the truck.  (Tr. I, 181, 198.)  Three people got

out of the Neon carrying baseball bats.  (Tr. I, 182.)  Whitacre saw Armstrong and Skibowski get

hit with the baseball bats, but could not tell which of the men hit them.  (Tr. I, 182, 197.)  Whitacre

never saw the person who got out of the driver's seat swing the bat or hit anyone with the bat.  (Tr.

I, 196, 202.)  Whitacre got back in the car when he heard one of the men from the other car yell,

"Grab a gun."  (Tr. I, 185.)  As they were getting in the truck, Whitacre heard a gunshot.  (Tr. I,

186.)  The gunshots continued and Whitacre ducked behind the front dashboard.  (Tr. I, 186.)

Whitacre did not see anyone from his group attack the men from the other car.  (Tr. I, 187.)

Whitacre, Skibowski, Armstrong and Fetters got in the Bronco and Fetters began driving while they

all were ducking down to avoid the gunfire.  (Tr. I, 176, 187.)  Whitacre did not see Slone again after

he got out of the truck.  (Tr. I, 184.)  The truck hit something as they were moving forward and then

Fetters backed up and drove out of the park.  (Tr. I, 188.)  The Neon followed them down the road

and continued to fire about five shots at the truck.  (Tr. I, 188-89.)  Five of Whitacre's car windows

were shot out during the incident.  (Tr. I, 192.) Armstrong was bleeding badly from his head and

Skibowski was bleeding from his face.  (Tr. I, 190-91.)

Whitacre testified that they kept driving until the police pulled them over.  (Tr. I,

193.)  Armstrong and Skibowski were transferred to the hospital by ambulance and Whitacre and

Fetters went to the police station.  (Tr. I, 193-94.)  Out of three men who got out of the Neon,

Whitacre only could positively identify Jeremy Joseph as the person who got out of the passenger

seat.  (Tr. I, 194, 197.)  Whitacre admitted that he initially told police that they only went to the park

to drink and did not mention anything about watching a fight.  (Tr. I, 195.)

Ricky Armstrong testified that, at some point after they arrived at the park parking

lot, a red Neon pulled in.  (Tr. II, 38.)  Armstrong could not see how many people were in the car.

(Tr. II, 28.)  Armstrong got out of the Bronco and was standing by the passenger door when he was hit from behind with a baseball bat.  (Tr. II, 38-39, 53.)  He did not see the person who hit him.  (Tr. II, 39.)  Armstrong was hit twice and fell to his knees.  (Tr. II, 40.)  When Armstrong heard something about a gun, he tried to get up and get in the truck.  (Tr. II, 42.)  By the time they got the Bronco doors closed, the men from the Neon started shooting out the windows.  (Tr. II, 42.)  Armstrong did not see anyone else from the Bronco get attacked, nor did he see anyone from the Bronco attack the Neon.  (Tr. II, 39.)  Armstrong thought that Fetters was driving when they left the park, but he was not certain.  (Tr. II, 51.)  Armstrong was struck with shotgun pellets in the hand, ear and nose.  (Tr. II, 43-44.)  After he got into the ambulance, Armstrong could not remember anything until he woke up at Borgess Hospital four days later.  (Tr. II, 47-48.)

Andrew Skibowski testified that they were starting to leave Lawless Park when a small red car drove into the lot.  (Tr. II, 84.)  Skibowski, who was driving the Bronco, turned around and parked directly in front of the car.  (Tr. II, 85.)  Skibowski could see three people in the red car.  (Tr. II, 85.)  Skibowski testified that Armstrong got out of the Bronco and started walking in front of the car when someone got out of the passenger side of the car and starting hitting Armstrong in the head with a baseball bat.  (Tr. II, 85.)  Before the man could deliver a third blow to Armstrong, Skibowski got out of the Bronco and grabbed the man from behind.  (Tr. II, 86.)  After Skibowski and the man fell to the ground, the man yelled, "Get the gun."  (Tr. II, 88.)  As Skibowski was trying to get up, he was hit with a hard object in the face and shoulder.  (Tr. II, 87.)  He jumped up and rounded the front corner of the truck just before the first shotgun blast.  (Tr. II, 88.)  Skibowski testified that he got in the truck and ducked in the back seat while the men fired several shots into the vehicle, causing pellets to ricochet around in the truck and smash out the windows.  (Tr. II, 90-

91.) Everyone was screaming and they could not find Slone. (Tr. I, 91.) The Bronco hit the other vehicle as they were trying to leave the parking lot. (Tr. I, 91.) The Neon followed them and fired more shots as they drove down the road. (Tr. I, 92.) Skibowski called 911 from his cell phone and the police stopped them several minutes later. (Tr. I, 92.) Skibowski had shotgun pellets in his arm and face. (Tr. I, 95-96.)

Skibowski testified that he lied in his initial statement to police at the hospital when he told them that they only were going to the park to party. (Tr. II, 100.) Skibowski was not entirely truthful because he did not want anyone to get into trouble. (Tr. II, 99.) After about half an hour, he called the officer back and told him the truth about why they went to the park. (Tr. II, 99.) Skibowski maintained that Fetters was driving when they left the park. (Tr. II, 100.) He denied that he and Fetters changed places before the police pulled them over because he was drunk. (Tr. II, 101.) Skibowski testified that Fetters offered to tell the police that he had driven all night because everyone else had gotten beat up and he had not done anything to help. (Tr. II, 102.)

Slone testified that there was no one at the park when they arrived, but when they started to leave, a red Neon pulled in the lot and parked. (Tr. II, 176.) The Bronco turned around and parked in front of the Neon. (Tr. II, 176.) Slone could see at least two people in the Neon. (Tr. II, 177.) Armstrong and Whitacre got out of the passenger side of the Bronco first, followed by Slone from the back seat. (Tr. II, 177.) The Bronco only had two doors, so Slone had to wait for the front seat passengers to get out before he could exit. (Tr. II, 177.) By the time Slone got to the front of the truck, he could see someone hit Armstrong with a baseball bat four or five times. (Tr. II, 177.) In order to help Armstrong, Slone went back to the truck and grabbed the jack handle. (Tr. II, 178.) When Slone appeared with the jack handle, the man with the bat backed away from

- 7 -

Armstrong.  Skibowski grabbed Armstrong and started dragging him to the Bronco.  (Tr. II, 178.)

Slone believed that it was him or Fetters that smashed the Neon's window, but he was not certain.

Slone also was hit by a baseball bat and the side of the face and was knocked out.  (Tr. II, 179.)

When Slone regained consciousness, he was under the Neon and someone was pulling him out by

the ankle.  (Tr. II, 180.)   After that, Slone passed out again.   The next time he regained

consciousness, he was by himself in the parking lot.  (Tr. II, 181.)   Slone started walking in the

direction of town so he could get help.  (Tr. II, 181.)  He was wearing only jeans and a long-sleeve

t-shirt, so he was very cold.  (Tr. II, 181.)  The police found him three of four hours later as he was

passing out in a ditch.  (Tr. II, 182.)

Slone described the people in the Neon as teenagers.  (Tr. II, 180.)   He did not get

a good look at the person who hit him, but identified Armstrong's attacker as Allan Hatton. (Tr. II,

179, 182.)  Slone testified that Armstrong's attacker had a big build and shorter hair.  (Tr. II, 179-

80.)  In addition to being hit with a bat, Slone sustained muffler burns and injuries from being run

over by a car.  (Tr. II, 183-84.)  Slone testified that he was unable to work as a result of the injuries

he sustained during the incident.  (Tr. II, 183.)

Derek Fetters, who was eighteen years old at the time of trial, testified that he knew

Sarah Taravet from hanging out with her brother and friends.  (Tr. I, 226.)  A couple of days before

December 12, 2005, Taravet called him crying because someone named "Allen" had made her upset.

(Tr. I, 226-27.)  Fetters was not previously acquainted with Petitioner, Allen Hatton or Jeremy

Joseph.  (Tr. I, 223.)  When Fetters called Allen Hatton, Hatton was very angry, started making

threats and ultimately set-up a fight with Fetters at Lawless Park.  (Tr. I, 228-29.)  Fetters went to

Legends and told Whitacre, Skibowski, Armstrong and Slone about his phone calls with Hatton.

(Tr. I, 231.) Fetters knew the men from working in construction with them. (Tr. I, 224.) The men made calls on their cell phones and were arguing and yelling at somebody on the other end. (Tr. I, 233.) About half an hour later, they all got into Whitacre's truck to go to the park. (Tr. I, 233.) At that point, Fetters really did not want to fight Hatton, but went along with them anyway. (Tr. I, 229-31, 233-34.) Fetters testified that they did not have a discussion in the car about a fight, but Armstrong handed him a jack handle. (Tr. I, 235.) Fetters kept the handle in his lap for a while, but put it back down in the back of the truck when they reached the park parking lot. (Tr. I, 235.)

Fetters testified that Skibowski pulled the Bronco up in front of the red Neon after it pulled into the parking lot. (Tr. I, 237.) Fetters could see three people in the car. (Tr. I, 237.) Armstrong got out first and started moving toward the Neon. (Tr. I, 240.) Fetters could not see if he had anything in his hands, but said it was possible that someone from his group broke the windows of the Neon. (Tr. I, 240, 249-50.) As soon as Armstrong started moving toward the Neon, the men in the Neon started to get out of the car. (Tr. I, 240.) About a minute after Armstrong got out of the car, Fetters heard someone yell, "Gun." (Tr. I, 241.) Fetters was in the truck most of that time and could not see what was happening. (Tr. I, 241-42.) After he heard the word, "gun," he could see someone open the trunk of the Neon. (Tr. I, 242.) At that point, everyone from his group, except Slone, ran back to the truck. (Tr. I, 243.) Fetters heard bullets hitting the truck and windows breaking. (Tr. I, 244.) The shooting continued as they drove away from the parking lot. (Tr. I, 245.) The Neon followed them down the road for a while and continued to shoot. They did not have any guns in the Bronco. (Tr. I, 247.) Someone in the Bronco called 911 and they kept driving until the police pulled them over. (Tr. I, 248.) Skibowski had been driving, but switched places with Fetters because he did not want to get a DUI. (Tr. I, 248.)

Fetters admitted to lying at the preliminary examination by testifying that he was driving when they left the park because he was afraid of Armstrong, Whitacre, Skibowski and Slone. (Tr. I, 249, 256.)  The men initially agreed to tell police that they went to the park to drink and Fetters was their designated driver.  (Tr. I, 257.)  Fetters denied telling an acquaintance, Donald Harrison, that the only way he could get Hatton to come to the park was to threaten his mother.  (Tr. I, 259.)  Fetters also denied telling Harrison that the he saw someone shooting a gun that looked smaller and Mexican.  (Tr. I, 259.)

Charles Owens, Jr. testified that Petitioner was his stepson and lived at his home on December 12, 2005.  (Tr. I, 158.)  Petitioner's friend, Allen Hatton, also lived at their home.  (Tr. I, 159.)  Owens bought Petitioner a red Neon about six months earlier.  (Tr. I, 160.)  Petitioner, Hatton and a third person left in the Neon around 11:00 p.m. on December 12.  (Tr. I, 160-161.)  Owens testified that Petitioner and Hatton came home around 2:00 a.m.  (Tr. I, 162.)  Petitioner's Neon was wrecked in the front and some of the windows were knocked out.  (Tr. I, 161.)  Petitioner asked if he could park the Neon in the garage.  (Tr. I, 162.)  According to Owens, Petitioner did not have a shotgun or any other firearms.  Owens owned a twelve gauge single shot, but it was not taken from the house on December 12.  (Tr. I, 163.)  Jeremy Joseph also was a friend of Petitioner's.  (Tr. I, 164.)  Owens described Joseph as tall and stocky with dark hair, and Hatton as shorter than Petitioner and very skinny with dark hair.  (Tr. I, 166.)

Sergeant Thomas Jacobs of the Cass County Sheriff's Department testified that he and Deputy Mike Fall responded to calls received from Lawless Park just after 11:00 p.m. on December 12, 2005.  (Tr. I, 130-31.)  When the officers reached the parking lot, no one was there, but they observed a large spot of blood, tire tracks, broken glass, shotgun shells, a jack handle,

stocking cap, a baseball cap and a baseball bat.  (Tr. I, 131-35.)  Jacobs also saw pieces from a red car.  (Tr. I, 140.)  The officers found additional spent shotgun shells about a quarter of a mile away in the snowbank along Monkey Run Road.  (Tr. I, 136.)  Monkey Run Road was the only way in and out of the park.  (Tr., 140-41.)

      Deputy Mike Fall of the Cass County Sheriff's Department testified that when they arrived at the Lawless Park parking lot, he observed a baseball bat, a metal pipe, spent shell casings and a lot of blood on the snow.  (Tr. II, 15.)  After conducting a search, Fall located Slone, who was hiding in brush on the side of Brownsville Road.  (Tr. II, 18-19.)  Slone was not wearing a coat and appeared to be very cold from being out in the elements for at least two hours.  (Tr. II, 19.)  Fall also observed that Slone had some blood in his hair and a burn on one of his forearms.  (Tr. II, 19-21.)  Slone was transported by ambulance to the hospital.  (Tr. II, 20-22.)  David Karn, the EMT who responded to the scene where Slone was found, testified that Slone had a ten-inch burn on his forearm and a one-inch laceration on the back of his head.  (Tr. II, 26.)

      Detective Richard Hiscock of the Cass County Sheriff's Department testified that he interviewed Petitioner in connection with this case.  (Tr. I, 269.)  Petitioner did not have any visible injuries.  (Tr. II, 194.)  A videotape of the interview was admitted into evidence.  (Tr. I, 271.)  When Hiscock told Petitioner that he wanted to talk to him about happened the previous night, Petitioner responded that he didn't know what Hiscock was talking about.  But when Hiscock asked what happened to Petitioner's car, he said, "I don't know, some dude smashed my windows out . . . . Some dudes we didn't even know."  (Tr. I, 271; Tr. III, 40.)  When Hiscock asked what Petitioner was doing out there, he responded, "Just chillin'."  (Tr. III, 40.)  Petitioner did not provide any further information about what happened at the park.  (Tr. I, 271-72.)  At some point during the

investigation, Hiscock went to Petitioner's home and spoke to his step-father, Charles Owens.  (Tr. II, 71-72.)  Hiscock talked to Owens about what happened to Petitioner's car and took photos of the car, which was still parked in the garage.  (Tr. II, 73.)  There was damage to the front end that was consistent with a collision and the back window was smashed out.  (Tr. II, 73-74.)  Hiscock testified that they were unable to locate Petitioner's fingerprints or DNA on any of the evidence collected in the case.  (Tr. II, 74-75.)

Dr. Todd Pryor testified that he treated Armstrong, Skibowski and Slone in the emergency department at Borgess-Lee Hospital on the night of December 12, 2005.  (Tr. I, 208.)  Skibowski had a gunshot wound by his right eyebrow, an abrasion to his lip with a laceration on the inside and two gunshot wounds to his right arm.  (Tr. I, 209.)  The pellet that went by his eyebrow ricocheted off his nose and ended up in the sinus below his eye.  (Tr. I, 210.)  The injury to Skibowski's lip was consistent with being hit with a baseball bat.  (Tr. I, 212.)  Armstrong had two large lacerations to the back of his head and had significant bleeding from the wounds.  (Tr. I, 214.)  Without treatment to stop the bleeding, Armstrong's injuries were life threatening.  (Tr. I, 214-15.)  Pryor believed that Armstrong was at risk of serious brain injury, so he was transferred by helicopter to Borgess in Kalamazoo.  (Tr. I, 215.)  With regard to Slone, Pryor observed bruises on the back of his head and right shoulder blade.  He also had burns on his right arm and left chest.  (Tr. I, 216.)  Slone told Pryor that he was assaulted and rolled under the car.  As he rolled under the car, he burned his arm and then the car drove over his legs.  (Tr. I, 216.)   Slone could not recall exactly what happened after that.  (Tr. I, 216.)  Pryor testified that the lacerations on the back of Slone's head were consistent with being hit with a bat and opined that he suffered a concussion.  (Tr. I, 216-219.)  Slone had methamphetamine, marijuana and alcohol in his system.  (Tr. I, 217.)

Detective Peter Vanderbrink of the Cass County Sheriff's Department testified that he, along with Detectives Small and Davis, searched the bedroom of Jeremy Joseph in connection with this case.  (Tr. II, 55-56.)  They found twenty-two shotguns in gun racks and a dresser containing "fashioned weapons, pipes, sticks, bats, wood made into weapon-type things," BB guns and/or paint ball guns and a loaded twenty-two revolver.  (Tr. II, 56-57.)  Later that evening, the officers returned to the Joseph residence and searched the property behind the residence.  (Tr. II, 57.)[2]  The officers went down a trail into the woods and discovered an old refrigerator laying on its back on the ground.  (Tr. II, 59.)  Inside the refrigerator, the officers found approximately twenty-five firarms, shotguns, a baseball bat and a large bag of shotgun shells.  (Tr. II, 59-60, 65.)  The firearms included a Winchester twelve-gauge shotgun, a Mossberg twelve-gauge shotgun, and an Ithica model nine hundred twelve-gauge semi-automatic shotgun.  (Tr. II, 63-64.)  Some of the firearms were loaded.  (Tr. II, 62.)

Philip Small testified that he worked as an evidence technician for the Cass County Sheriff's Department.  (Tr. II, 105.)  Small took photographs and collected evidence from Lawless Park in connection with this case.  (Tr. II, 107.)  In the parking lot, Small photographed and collected jack handles, several spent twelve-gauge shotgun shells, an aluminum baseball bat, baseball caps, a stocking cap, broken glass, and a piece from a vehicle.  (Tr. II, 111-14, 117-124, 129.)  Most of the evidence was collected in an area that was about fifteen feet by twenty feet.  (Tr. II, 123.)  Small took photographs of the tire tracks in the parking lot and made some tire track castings.  (Tr. II, 132.)  Outside of the park, Small recovered several spent shotgun shells along

---

[2]Detective Beth Davis of the Cass County Sheriff's Department testified that she located and interviewed Allen Hatton in connection with this case.  (Tr. II, 70.)  Following the interview, Davis contacted Detective Vandenbrink with information regarding the location of firearms.  (Tr. II, 70.)

Monkey Run Road.  (Tr. II, 127-28.)  Small went to the hospital to collect shotgun pellets that were removed from one of the victims.  (Tr. II, 129.)  Small could not determine whether any of the firearms recovered from the Joseph residence were used during the incident at Lawless Park.  (Tr. II, 153-54.)

Small testified that he also collected evidence from the two vehicles involved in the incident.  He first went to the Hatton residence and collected evidence from the red Neon. (Tr. II, 130.) Small located a spent twelve-gauge shotgun shell behind the driver's seat. (Tr. II, 131.) He also found a baseball bat in the Neon. (Tr. II, 146.)  With regard to the Ford Bronco, Small observed that the passenger side and rear of the truck were peppered with shotgun BBs.  (Tr. II, 134, 140-141.) Many of the windows and the windshield were broken out.  (Tr. II, 135.)  The front bumper had a red paint smear that was consistent with a collision with a red vehicle.  (Tr. II, 140.)  Small also located some wadding on the floor behind the driver's seat, which indicated that the shotgun was fired from close range to the truck.  (Tr. II, 144-45.)   Small found a jack in the Bronco that matched-up with the jack handles found in the park.  (Tr. II, 152.) Fingerprints from the weapons and baseball bats recovered in the case were sent for analysis, but no matches were made.  (Tr. II, 146.)  The jack handles did not have finger prints on them.  (Tr. II, 152.)

Sixteen-year-old Britney Rosell testified that she knew Jeremy Joseph, Allen Hatton and Petitioner.  (Tr. II, 155-57.).  Rosell testified that Petitioner had introduced her to Joseph, and that Joseph had been her boyfriend for almost two years.  (Tr. II, 156-57.)  Rosell was at Joseph's house on or around December 12, 2005.  (Tr. II, 158.)  Rosell testified that Hatton also was there and received a phone call from Lindsey Dressler, but did not seem to get upset or agitated by it.  (Tr. II, 158.)  After that, Joseph and Hatton had some phone conversations that made them a little upset.

- 14 -

(Tr. II, 160.)  Petitioner was not present during those conversations.  (Tr. II, 161.)  Rosell testified that Joseph never told her anything that might have happened in Lawless Park.  (Tr. II, 160.)

Allen Hatton, who was eighteen years old at the time of trial, took the stand, but refused to answer the prosecutor's questions and invoked his right to remain silent.  (Tr. II, 162.) After the jury was excused, Hatton indicated that he refused to testify notwithstanding the grant of immunity, and, thus, was held in contempt of court.  (Tr. II, 163-68.)

Following closing arguments, the trial court instructed the jury on the various charges against Petitioner.  (Tr. III, 69-100.)  The court first instructed the jury on the charge of conspiracy to commit an assault with the intent to murder, with the lesser included offenses of conspiracy to commit an assault with intent to commit great bodily harm less than murder and conspiracy to assault with a dangerous weapon.  (Tr. III, 77-80.)  Next, the court instructed the jury on four counts of assault with intent to murder.  The court also instructed on the lesser offenses of assault with intent to do great bodily harm less than murder and assault with a dangerous weapon (felonious assault).  (Tr. III, 80-83.)  Next, the court instructed on the charges of armed with a dangerous weapon with unlawful intent and intentionally discharging a firearm from a motor vehicle.  (Tr, III, 83.)  Finally, Petitioner was charged with possessing a firearm at the time he committed each of the offenses listed above.  (Tr. III, 83-85.)

The jury found Petitioner guilty of conspiracy to commit an assault with the intent to murder; four counts of the lesser offenses of assault with a dangerous weapon (bat), carrying a weapon with unlawful intent, discharging a firearm from a motor vehicle, and eight related counts of felony-firearm.  (Tr. III, 100-117.)  On July 14, 2006, the trial court sentenced Petitioner to 6 to 10 years' imprisonment for conspiracy to commit assault with intent to murder; 2 to 5 years'

imprisonment for carrying a firearm with unlawful intent; 2 to 4 years' imprisonment for each of the four felonious assault convictions and for his conviction of intentionally discharging a firearm from a motor vehicle; and two years' imprisonment for each of the eight counts of felony-firearm. (Sentencing Tr., 17-20, docket #16.)

>           **B.      Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on February 22, 2007, raised the same three issues as raised in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #17.)   By unpublished opinion issued on November 20, 2007, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 11/20/2007 Mich. Ct. App. Opinion (MCOA Op.), docket #17.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered April 28, 2008, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #18.)

>                    **<u>Standard of Review</u>**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot

be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429

- 17 -

(6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

## Discussion

### I.  Sufficiency of the evidence

Petitioner's first two grounds for habeas corpus relief challenge the sufficiency of the evidence. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). Because both the *Jackson v. Virginia* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should

be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

In Ground I, Petitioner argues that the prosecutor presented insufficient evidence that he was present at the time of the offenses or that he aided and abetted the offenses. Specifically, Petitioner contends that none of the complainants could identify Petitioner as a participant in the events and there was no physical evidence, such as fingerprints or DNA, placing Petitioner at the park. Petitioner contends that while the evidence showed a possibility of his presence at the park at the time of the incident, the evidence did not prove beyond a reasonable doubt that he was present at the park at the time of the incident, or that he aided and abetted the assaults. With regard to the aiding and abetting theory, Petitioner asserts that there was no evidence that Petitioner knew a fight had been planned by Hatton, that he was aware of weapons in his car or that Hatton and/or Joseph intended to assault the complainants with bats and a shotgun.

The Michigan Court of Appeals rejected Petitioner's claim, stating:

Defendant first argues that the prosecutor did not present sufficient evidence from which a rational jury could find that he was present at the December 12, 2005 altercation in Lawless Park, which gave rise to his convictions. We disagree.

In all cases, the identity of a defendant as the perpetrator of a crime must be proven by the prosecution beyond a reasonable doubt. *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Circumstantial evidence, and reasonable inferences drawn from it, may be sufficient to prove the elements of a crime, including the identity of the perpetrator. *Id.*; *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993).

In the instant matter, the prosecutor presented a significant amount of circumstantial evidence, which supported an inference that defendant was one of the three assailants who attacked the victims in Lawless Park. The evidence included that: defendant left his stepfather's house with at least one of the other assailants shortly before the altercation; he was in a car that matched the descriptions given by the victims; he implicitly acknowledged to the police that he was at Lawless Park when the altercation occurred; his vehicle was intact at 11:00 p.m., but heavily

damaged by 2:00 a.m.; he acknowledged that people he was unfamiliar with shattered the windows of his car; there were three assailants; and defendant was well acquainted with the other two. While defendant argues that his statement to the police alone does not establish his presence at the scene of the altercation, as mentioned above, defendant's statement was not the only evidence that supported an inference that he was present during the altercation. It is for the trier of fact to determine what inferences can be fairly drawn from the evidence and to determine the weight to be accorded to the inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002); *People v Wolfe*, 440 Mich 508, 515-516; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Therefore, after drawing all reasonable inferences in a light most favorable to the prosecution, we determine that the prosecutor presented sufficient evidence from which a rational jury could find that defendant was present during the altercation.

Defendant next argues that the prosecutor failed to present sufficient evidence to convict him, based on an aiding and abetting theory, of the assaults. We disagree:

The elements of felonious assault are: (1) an assault, (2) with a dangerous weapon, and, (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery. *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). In Michigan, there is no distinction between principals and accessories for purposes of establishing culpability. MCL 767.39. To convict defendant under an aiding and abetting theory, the prosecutor was required to present evidence that; "(1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *People v Carines*, 460 Mich 750, 768; 597 NW2d 130 (1999). The requisite intent to convict a defendant as an aider and abettor is the same intent necessary to convict the principal of the underlying crime. *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001).

The evidence at trial supported that defendant was present during the assaults, and performed at least one act that allowed his co-defendants to commit the assaults. Specifically, he allowed them to travel to Lawless Park in his car. One of the victims testified that the two passengers of the red Dodge Neon each possessed baseball bats when they departed from the car, which supported an inference that, regardless whether defendant was the driver or a passenger, he was aware of the co-defendants' intent to assault the victims with a dangerous weapon. An aider and abettor's state of mind may be inferred from all the facts and circumstances. *Carines, supra* at 757-758. While defendant argues that the victims presented inconsistent stories at trial regarding the actions of the assailants during the altercation, all conflicts in the evidence must be resolved in favor of the prosecution when presented with a

- 20 -

challenge to the sufficiency of the evidence. *People v Terry*, 224 Mich App 447, 452; 569 NW2d 641 (1997).

(MCOA Op. 1-2.)

The prosecutor was not required to present any direct evidence of Petitioner's presence at the crime scene, but could rely on sufficient circumstantial evidence. *See Wiggins v. Parker*, 423 F. App'x 534, 538 (6th Cir. 2011). Federal courts repeatedly have held that "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (quoted case omitted); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction . . . ."); *Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence . . . . In both, the jury must use its experience with people and events in weighing the probabilities."); *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) ("[P]hysical evidence is not a prerequisite to sustaining a conviction.").

Moreover, under Michigan law, reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. *See People v. Allen*, 505 N.W.2d 869, 871 (Mich. Ct. App. 1993); *Saxton v. Sheets*, 547 F.3d 597, 606–07 (6th Cir. 2008).

In this case, the prosecutor presented strong circumstantial evidence that Petitioner was present at Lawless Park at the time of the altercation with the complainants. Petitioner was well acquainted with Allen Hatton and Jeremy Joseph, and Hatton lived at Petitioner's residence. (Tr. I, 153, 159, 164; Tr. II, 155-57.) Hatton set up the fight with Fetters at Lawless Park. (Tr. I, 145-49, 228-29.) The complainants testified that three men arrived at Lawless Park in a red Neon. (Tr. I,

- 21 -

180-82, 194, 197, 237; Tr. II, 38, 84-85, 176.)  Jeremy Joseph and Allen Hatton were identified by the complainants as two of the occupants of the Neon.  (Tr. I, 194, 197; Tr. II, 179, 182.)  One of the complainants saw all three occupants of the Neon get out of the car with baseball bats in their hands.  (Tr. I, 182, 194, 197.)  Three of the complainants were struck by baseball bats.  (Tr. I, 182, 197; Tr. II, 38-39, 85, 177-179.)  Upon hearing one of the men from the Neon yell "grab a gun" or "get the gun," another man from the Neon retrieved a shotgun from the trunk of the car and the firing began.  (Tr. I, 185-86, 242-46; Tr. II, 42, 88, 177.)  The Bronco struck the front end of the red Neon as the complainants were trying to leave the parking lot while under fire.  (Tr. I, 188; Tr II, 91.)

Petitioner's stepfather testified that Petitioner left the house in his red Neon with Hatton and a third person around 11:00 p.m. on December 12, 2005.  (Tr. I 160-161.)  When Petitioner returned home at 2:00 a.m., the front of his car was wrecked and some of the windows were smashed out.  (Tr. I, 161-62; Tr. II, 73-74.)  Petitioner asked his stepfather if he could keep his car in the garage for the night.  (Tr. I, 162.)  The police later recovered a baseball bat and a spent twelve-gauge shotgun shell behind the driver's seat of Petitioner's Neon.  (Tr. II, 146.)  In addition, the police found a cache of weapons in Jeremy Joseph's bedroom and many more weapons hidden in the woods behind his home.  (Tr. II, 56-65.)  The weapons included baseball bats and shot guns.  (*Id.*)  Police officers learned the location of the weapons in the woods after an interview with Hatton.  (Tr. II, 70.)  Officers also found numerous 12-gauge shotgun shells and two baseball bats at the crime scene.  (Tr. I, 135-36; Tr. II, 17, 111-14, 117-22, 147-48.)

When Detective Hiscock interviewed Petitioner, he denied knowing what occurred, but when asked what happened to his car the night before, Petitioner responded that some dude smashed his windows out.  (Tr. I, 271; Tr. III, 40.)  Petitioner said that it happened at Lawless Park.

(Tr. I, 271.) When asked who had done that, Petitioner answered, "I don't know. Some dudes we didn't even know." (Tr. I, 271; Tr. III, 40.) When Detective Hiscock asked what Petitioner was doing out there, he responded, "Just chillin'." (Tr. III, 40.)

    The circumstantial evidence cited above was more than ample to support an inference that Petitioner, Hatton and Joseph drove together in Petitioner's Neon to Lawless Park and that Petitioner was present at the time the offenses were committed. In addition to the circumstantial evidence, the jury could reasonably have construed Petitioner's statement to police as an implicit acknowledgment that he was at Lawless Park when the altercation occurred.

    Moreover, viewing the evidence in a light most favorable to the prosecution, sufficient evidence was presented to support Petitioner's four felonious assault convictions under an aiding and abetting theory. In rejecting a sufficiency of the evidence claim under an aiding-and-abetting theory, the Sixth Circuit recently reiterated the "nearly insurmountable hurdle" faced by a Petitioner asserting a claim of insufficient evidence:

> We further note that the *Jackson v. Virginia* standard is so demanding that "[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle." *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009) (internal quotation marks omitted). Adding to this extremely high bar are the stringent and limiting standards of AEDPA. Under AEDPA, we may reverse a state court's decision that correctly identified and applied the controlling Supreme Court precedent only if the application of that precedent was "objectively unreasonable," meaning "more than incorrect or erroneous." *Wiggins*, 539 U.S. at 520–21, 123 S.Ct. 2527 (citations and internal quotation marks omitted); see also *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (internal quotation marks omitted)).

*Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011); *see also White v. Steele*, 602 F.3d 707, 709–11 (6th Cir. 2009) (denying relief on an aiding-and-abetting, sufficiency-of-the-evidence argument).

The felonious assault convictions in this case rested upon the use of bats, not the shooting.  As discussed above, the prosecutor presented overwhelming evidence that Petitioner, Hatton and Joseph drove to Lawless Park in Petitioner's red Neon.  Evidence that all three of the men got out of the Neon with baseball bats supports the strong inference that multiple baseball bats were present in the passenger compartment of the Neon before the assaults occurred.  Moreover, a total of three bats were recovered by police - two from the park and one from behind the driver's seat of Petitioner's car. (Tr. II, 115, 146.) At the very least, the jury could have reasonably inferred that Petitioner supported or assisted his co-defendants by allowing them to use his car to get to the park with the knowledge that they intended to assault the complainants with bats.  Applying the AEDPA standard, I cannot find that the decision of the Michigan Court of Appeals was an objectively unreasonable application of *Jackson*.

In his second ground for habeas corpus relief, Petitioner contends that there was insufficient evidence that he conspired with co-defendants to commit assault with intent to murder. In support of his claim, Petitioner argues that there was no evidence that he was involved in the heated phone conversations with Fetters, that he participated in planning the fight or placing the weapons in his car, that he drove his car to the park or that he was even in the car.  Petitioner suggests that because Hatton lived at Petitioner's residence, he may have had access to Petitioner's car.  Petitioner further argues that there was no evidence that he made the remark to get the gun or that he was the person who retrieved the gun from the car.

The Michigan Court of Appeals found that sufficient evidence was presented to support Petitioner's  conviction for conspiracy to commit assault with intent to murder, stating:

> A conspiracy is a voluntary mutual agreement or understanding between two
> or more people to commit a criminal act. *People v Blume*, 443 Mich 476, 481, 485;

505 NW2d 843 (1993). The elements of conspiracy are: (1) defendant intended to combine with another person; and, (2) the participants intended to accomplish an illegal objective. *Mass, supra*, 464 Mich at 629. The prosecutor is required to prove that the parties "specifically intended to further, promote, advance, or pursue an unlawful objective." *People v Justice (After Remand)*, 454 Mich 334, 347; 562 NW2d 652 (1997). A conspiracy is complete upon formation of the agreement; therefore, no overt act in furtherance of the conspiracy must be shown to support a conviction. *People v Cotton*, 191 Mich App 377, 393; 478 NW2d 681 (1991). A conspiracy may be proven by circumstantial evidence or based on inference. *Id.*

At trial, the prosecutor presented evidence that co-defendant Allen Hatton and one of the victims arranged a fight in Lawless Park, that defendant left his stepfather's house at 11:00 p.m. with Hatton and the one other man on the night of the fight, that the assailants traveled to the scene of the altercation together in defendant's car, that defendant's car contained at least one baseball bat and a shotgun before the incident, and that defendant was present during the subsequent altercation. The prosecutor also presented evidence that, while two of the assailants were attacking the victims with baseball bats, one of those two assailants yelled, "grab the gun," or "get the gun." Subsequently, one of the other assailants obtained a shotgun from the trunk of defendant's car, and began firing it at the victims.

Proof of a conspiracy may be derived from the circumstances, acts, and conduct of the parties during the crime, and inferences are permissible. *Justice, supra* at 347. Minimal circumstantial evidence is sufficient to prove intent. *People v Fennell*, 260 Mich App 261, 270271; 677 NW2d 66 (2004). While defendant argues that the victims' descriptions of the assault could have given rise to an inference that only two of the assailants were involved in the assault, the prosecutor was not required to disprove every reasonable theory consistent with innocence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

(MCOA Op. 2-3.)

Contrary to Petitioner's assertions, the prosecutor presented sufficient circumstantial evidence to support Petitioner's conspiracy conviction.  As discussed with regard to Ground I, above, the prosecutor presented overwhelming circumstantial evidence at trial that Petitioner, Hatton and Joseph drove to Lawless Park and were present during the altercation with the complainants. Evidence also was presented that three men arrived at Lawless Park in a red Neon and got out of the car with baseball bats in their hands.  (Tr. I, 180-82, 194, 197, 237; Tr. II, 38, 84-85, 176.)  While

- 25 -

two of the assailants were attacking the victims with baseball bats, one of those two assailants yelled, "grab the gun," or "get the gun." Shortly thereafter, one of the assailants obtained a shotgun from the trunk of Petitioner's car, and began firing it at the victims. (Tr. I, 185-86, 242-44; Tr. II, 42, 88, 177-78.) Petitioner's friend, Jeremy Joseph, who was identified as one of the assailants, was later found to have a cache of weapons in his bedroom and in the woods behind his home, including a 12-gauge shot gun. (Tr. I, 153, 164, 197; Tr. II, 56-65, 155-57.) Police also found a bat and a spent shotgun shell in the passenger compartment of Petitioner's car following the incident. (Tr. II, 146.)

        In light of the circumstantial evidence of an agreement between Petitioner and his co-defendants to go to Lawless Park and assault Fetter with baseball bats and, if necessary, a shotgun,

I cannot find that the decision of the Michigan Court of Appeals was an objectively unreasonable application of *Jackson.* The evidence that one assailants yelled, "grab the gun," or "get the gun" and another assailant obtained a shotgun from the trunk of Petitioner's car showed that at least two of the three men in the Neon were aware that there was a gun in the truck. Even if Petitioner was not one of those two men, it was reasonable for the jury to infer that Petitioner was aware of the shotgun in the trunk of his own car. While Petitioner contends that there was no direct evidence that he acted in furtherance of the conspiracy, a conspiracy is complete upon formation of the agreement; no overt act in furtherance of the conspiracy must be shown to support a conviction. *Cotton*, 478 N.W.2d at 689. Moreover, a conspiracy may be proven by circumstantial evidence or based on inference. *Id.* Petitioner, therefore, is not entitled to habeas corpus relief.

## II.    Co-Defendant Allen Hatton's invocation of his right to remain silent

In Ground III, Petitioner claims that the trial court erred by permitting co-defendant Allen Hatton to take the stand at trial without first determining whether Hatton was going to assert his Fifth Amendment right not to testify.  He further asserts that trial counsel was ineffective for failing to object to Hatton being called as a witness before the jury and not insisting that the privilege be exercised outside the presence of the jury.  Petitioner contends that he was substantially prejudiced because the jury may have inferred from Hatton's invocation of his right to remain silent that he was involved with Petitioner in the commission of the charged offense.

During opening statements, the prosecutor told the jury that Allen Hatton would be called as a witness at trial.  He further stated:

> [Y]ou may see that he [sic] some difficulty answering questions because he's a friend, and you may see that he doesn't even want to be here to answer these questions.  We expect that the testimony he's going to give is going to lay out for you exactly what happened, exactly how when these calls were going back and forth he got his buddies and he rounded them up and they went and they got guns.  They each got shotguns, and they put those guns in the trunk, and they drove to the fight."

(Tr. I, 115.)  The prosecutor called Hatton as a witness on the second day of trial.  Hatton gave his name and age, but when the prosecutor asked Hatton if he knew Jeremy Joseph, he stated that he could not answer the question.  (Tr. II, 162.)  When asked why he would nor answer the question, Hatton stated that he wanted to remain silent.  (Tr. II, 162.)  The prosecutor asked the Court to instruct Hatton to answer and the court excused the jury.  (Tr. II, 162.)  Outside the presence of the jury, the trial court held Hatton on contempt of court because he refused to answer questions after being granted immunity.  (Tr. II, 163-167.)  When the jury returned, the trial court indicated that Hatton had been excused.  (Tr. II, 168.)

- 27 -

Respondent argues that Petitioner's claim is procedurally defaulted because Petitioner failed to raise a contemporaneous objection at trial.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001).

Michigan has a contemporaneous objection rule that was enforced in this case, as Petitioner made no objection before the trial court to the trial court's failure to determine before Hatton took the stand whether he intended to assert his Fifth Amendment right to remain silent.  Pursuant to this contemporaneous-objection rule, a party's failure to object leads to the claims being waived and reviewed solely for plain error.  *See Lancaster v. Adams*, 324 F.3d at 437.  In this case, the Michigan Court of Appeals explicitly stated that the claim would be reviewed only for plain error because Petitioner failed to raise a contemporaneous objection and/or a request for a curative instruction.  (MCOA Op., 3.)  This procedural rule kept the state court from fully reviewing the merits of Petitioner's claim, and constitutes an adequate and independent state ground for foreclosing federal review.  "Failure to comply with well-established and normally enforced procedural rules usually constitutes 'adequate and independent' state grounds." *Lundgren*, 440 F.3d

- 28 -

754, 763 (6th Cir. 2006). Michigan's contemporaneous-objection rule is both a well-established and normally enforced procedural rule. *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011). Thus, Petitioner's claim was procedurally defaulted.

As a result of Petitioner's default, review by this Court is barred unless Petitioner can show cause and prejudice or that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. However, the Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

The Michigan Court of Appeals found no plain error arising from the trial court's failure to determine whether Hatton would assert his Fifth Amendment right before allowing him to take the stand, stating:

> Defendant is correct that a lawyer may not intentionally call a witness knowing that the witness will claim a valid privilege and refuse to testify. *People v Giacalone*, 399 Mich 642, 645; 250 NW2d 492 (1977). However, nothing in the record supports that the prosecutor knew that Hatton would invoke the privilege. It could be argued, in fact that the prosecutor fully expected Hatton to testify, given that he was given immunity for his testimony at trial.

> When called to testify, Hatton refused to answer questions about whether he knew defendant or his other codefendant. Defendant's stepfather previously testified that defendant resided at his house with Hatton, and the other co-defendant's girlfriend previously testified that defendant frequently spent time with Hatton and the other co-defendant. Thus, even if the jury assumed that Hatton's refusal to testify served as an implicit admission of the questions he was asked, the information sought by way of those questions was already established at trial. Therefore, defendant cannot show that any error was outcome determinative. *Carines, supra* at 763-764. In addition, because defendant cannot show on the record presented to this Court that, but for the alleged error of his trial counsel, the outcome would have been different, defendant cannot establish that he was denied the effective assistance of counsel. *People v Plummer*, 229 Mich App 293, 307; 581 NW2d 753 (1998).

(MCOA Op. 3.)

The argument presented in Petitioner's state-court appellate brief focused on state law requirements when a trial court has reason to know that a witness will invoke a testimonial privilege.

To the extent Petitioner asserts that the trial court committed error under state law, he fails to raise a cognizable claim for purposes of federal habeas corpus review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry into whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas

review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). As discussed by the Michigan Court of Appeals, the prosecutor and the trial court in this case had no reason to believe that Hatton would invoke his Fifth Amendment rights, particularly when he had been granted immunity, and thus did not have a valid Fifth Amendment privilege. Consequently, Petitioner cannot show that the trial court's failure to pre-determine whether Hatton would invoke his Fifth Amendment rights denied Petitioner a fundamentally fair trial.

While the bulk of Petitioner's appellate argument focused upon state law, he also asserted violations of his federal constitutional rights and cited the United States Supreme Court decisions in *Namet v. United States*, 373 U.S. 179 (1963) and *Frazier v. Cupp*, 394 U.S. 731 (1969).[3] In *Namet*, the petitioner challenged his conviction claiming that the prosecutor impermissibly asked two witnesses incriminating questions concerning their relationship with him, with the knowledge

---

[3]It is unclear whether the federal claims referenced in Petitioner's appellate brief were "fairly presented" to the Michigan Court of Appeals as Petitioner cited the constitutional provisions and federal cases only once and did not include any further argument or discussion of the relevant federal law. *See Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.) In reviewing Petitioner's claim for plain error, the Michigan Court of Appeals did not address the alleged federal constitutional violations. Even assuming Petitioner's federal claims were properly exhausted, he cannot establish a violation of his federal rights.

that the witnesses would invoke their Fifth Amendment privilege. *Namet*, 373 U.S. at 180. Both witnesses, who had been indicted with petitioner and had pleaded guilty, were eventually compelled to testify at trial. Addressing the petitioner's claim that the trial court committed error by allowing the government to question the witnesses after their lawyer had advised the trial court that, if called to the stand, each would invoke the Fifth Amendment privilege, the Supreme Court rejected the suggestion that reversible error was "invariably" committed whenever a witness claimed his privilege not to answer a question. *Namet*, 373 U.S. at 186. The Supreme Court then noted that lower courts considered the surrounding circumstances in each case, particularly two factors that tended to suggest evidentiary error had occurred: first, "error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," *id.* at 186; and second, when, "in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187.

The *Namet* Court addressed the second "critical weight" factor to determine whether Petitioner's Sixth Amendment right to confrontation had been violated. According to the Court, the effect of the witnesses' "few invocations of privilege" was minimized by their "lengthy nonprivileged testimony" connecting the petitioner with the crime and corroborating the government's case. *Namet*, 373 U.S. at 189. Moreover, the witnesses' refusal to testify was not the "only source, or even the chief source, of the inference that the witness[es] engaged in criminal activity with the defendant." *Id.* In rejecting the petitioner's claim, the Court reasoned that "the few

claims of testimonial privilege were at most cumulative support for an inference already well established by the nonprivileged portion of the witness[es'] testimony." *Id.*

In a subsequent case, *Douglas v. Alabama*, 380 U.S. 415 (1965), the Supreme Court relied upon *Namet*'s "critical weight" theory to find that the defendant's constitutional right to confront witnesses at trial had been violated. In the petitioner's trial for assault with intent to murder, the prosecution called to the stand a witness who had been indicted with defendant, tried separately, and found guilty. *Douglas*, 380 U.S. at 416. The witness, who planned to appeal his conviction, asserted his Fifth Amendment right not to incriminate himself. The trial court ruled that the witness could not rely on his Fifth Amendment privilege and allowed the state to cross-examine him as a hostile witness. *See id.* The state prosecutor proceeded to read into evidence, under the "guise of cross-examination," a confession purportedly signed by the witness. *Id.* The witness asserted his privilege at every opportunity, but the prosecutor continued until he had read the entire confession to the jury.

The *Douglas* Court found that the prosecutor's conduct violated the petitioner's Sixth Amendment right to confrontation. After affirming that "a primary interest secured by [the Confrontation Clause of the Sixth Amendment] is the right of cross-examination," *Douglas*, 380 U.S. at 418, the Supreme Court held that petitioner's "inability to cross-examine [the witness] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* at 419. The Supreme Court noted that while the prosecutor's reading of the confession was "not technically testimony," it "may well have been the equivalent in the jury's mind" and that the witness's invocation of the Fifth Amendment privilege may have had the effect of creating the inference both that the statements in the confession were made and that they

- 33 -

were true. *Id.* Because the witness refused to acknowledge the confession as his, the Court noted that the substance of that confession and the inferences drawn therefrom were effectively presented to the jury in a form not subject to confrontation. Because the confession was the only direct evidence connecting petitioner with the crime and establishing his mental state, and thus was a fundamental part of the State's case against petitioner, the Supreme Court held that the denial of the right of cross-examination unfairly prejudiced the defendant. *Id.* at 420 (*citing Namet*, 373 U.S. at 187).

Finally, in *Frazier v. Cupp*, 394 U.S. 73, 7331 (1969), the Supreme Court rejected the petitioner's claim of error that the prosecutor violated his Confrontation Clause rights by referring to a witness's testimony in his opening statement after having been informed by defense counsel that the witness would refuse to testify. The witness in question was petitioner's cousin, who had been indicted with defendant for murder and had pleaded guilty. In his opening statement, the prosecutor referred to testimony that he expected the cousin to give; the reference to the cousin was not lengthy, nor was the cousin's testimony touted as critical to the prosecution's case. *Id.* at 733-34. In the course of the trial, the prosecutor called the cousin to the stand. The witness asserted his Fifth Amendment privilege not to incriminate himself, and he was dismissed. His appearance lasted for approximately two to three minutes. *Id.* at 734. At the close of the evidence, the judge cautioned the jurors not to credit any statements made by counsel concerning the facts of the case as evidence. *Id.* at 734.

On appeal, the petitioner argued that, similar to *Douglas*, the prosecutor's actions served to place the cousin's testimony before the jury in a way that "may well have been the equivalent in the jury's mind of testimony." *Frazier*, 394 U.S. at 734 (*quoting Douglas*, 380 U.S.

at 419).  According to the petitioner, the statement "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination."  *Id.*  The Supreme Court's analysis focused on the impact of the prosecutor's opening statement to the jury and the curative effect of the trial court's instruction to the jury.  The Supreme Court noted that, unlike *Douglas*, the cousin was only on the stand for a short period of time and only a paraphrase of his testimony was placed before the jury during the prosecutor's opening statement.   The Court noted that this procedure "was much less damaging than was the case in *Douglas*," and that the witness's statement was not a "vitally important part of the prosecution's case."  *Id.* at 735.  Therefore, the Court concluded that the trial court's limiting instructions sufficiently protected the petitioner's constitutional right to confrontation.

        The Sixth Circuit has interpreted these Supreme Court cases as standing for the proposition that, "under certain circumstances, a witness's invocation of the Fifth Amendment privilege before the jury creates the unfavorable inference that the witness and the defendant engaged in criminal conduct together, or that the witness has evidence that inculpates the defendant."  *Thomas v. Garraghty*, 18 F. App'x 301, 308 (6th Cir. 2001).  The circumstances of this case do not present such an unfavorable inference.  Like *Frazier*, the prosecutor presented only a brief introduction of Hatton's anticipated testimony during opening statements and did not ask Hatton any substantive questions during his brief appearance on the stand.  Unlike *Douglas*, the prosecutor did not read any confession or statement from Hatton into the record.  While nothing in *Douglas* excludes the possibility that the witness's mere presence on the stand could create an inference unfavorable to the defendant which would add critical weight to the prosecution's case, *Thomas*, 18 F. App'x at 309, Hatton's refusal to testify was not a primary source of the inference

that Hatton engaged in criminal activity with Petitioner.  As discussed above with regard to Petitioner's claims of insufficiency of the evidence, the prosecutor presented substantial circumstantial evidence that Petitioner participated with Hatton and Joseph in attacking the complainants with bats and at least one shotgun.  Accordingly, Petitioner cannot show that Hatton's refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, thus violating his Sixth Amendment right to confrontation.

In *Namet*, the Supreme Court also recognized that prosecutorial misconduct can occur when the prosecutor makes "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Namet*, 373 U.S. at 186.  However, "merely calling a witness to the stand, even knowing that he will assert Fifth Amendment rights, does not rise to the level of constitutional violation."  *Thomas*, 18 F. App'x at 311 (internal quotation omitted).  In *Thomas*, the prosecutor knew that the witness would refuse to testify, but believed that he was entitled to put the witness on the stand to preserve his own credibility with the jury and because the witness did not have a valid privilege.  *Id.*  The prosecutor did not attempt to ask substantive questions of the witness in order to place the equivalent of the witness's testimony before the jury, nor did he refer to the witness's testimony in his closing argument.  The Sixth Circuit held that, viewing the prosecutor's actions in the context of the entire trial, it was clear that he did not engage in a "'planned or deliberate attempt[ ] by the [state] to make capital out of [the] witness['s] refusal [ ] to testify.'" *Id.* at 311 (*quoting Namet*, 373 U.S. at 189).

The instant case is much like *Thomas*, except there is no evidence whatsoever that the prosecutor or defense counsel were aware that Hatton would invoke his Fifth Amendment rights at Petitioner's trial.  Like the witness in *Thomas*, Hatton did not have a valid privilege since he had

been granted immunity by the prosecutor.  Thus, the prosecutor had every reason to believe that Hatton would testify at trial, however reluctantly.  The prosecutor did not ask Hatton substantive questions while he was on the stand in order to place the equivalent of the witness's testimony before the jury.  Consequently, Petitioner cannot demonstrate that the prosecutor engaged in misconduct by intentionally trying to build his case out of inferences arising from Hatton's refusal to testify.  *See Namet*, 373 U.S. at 186.

Petitioner also contends that his trial counsel was ineffective for failing to object to Hatton being called as a witness before the jury and not insisting that the privilege be exercised outside the presence of the jury.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

As previously discussed, there is nothing on the record that would have given defense counsel reason to believe that Hatton would invoke his Fifth Amendment privilege, particularly after he was granted immunity.   Thus, I cannot find that counsel's failure to raise the issue with the trial court before Hatton took the stand fell below an objective standard of reasonableness.  Moreover, in light of the substantial circumstantial evidence of Petitioner's guilt and the circumstances surrounding Hatton's invocation of his Fifth Amendment rights, Petitioner cannot establish that he was denied a fundamentally fair trial as the result of any inference that may have been created in the jurors' minds by Hatton's invocation of his Fifth Amendment right. Consequently, I cannot find that the decision of the Michigan Court of Appeals was an unreasonable application of the highly deferential *Strickland* standard.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:   February 2, 2012                     /s/ Hugh W. Brenneman, Jr.
                                              Hugh W. Brenneman, Jr.
                                              U.S. Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).